The case of Brian DeLatorre v. DJW-Ridgeway Building Consultants and Jason DeMason, Inc. Good morning. Good morning, Your Honor. This is Michael Rasek. I am here on behalf of the plaintiff appellant, Brian DeLatorre. The part where we call this is the case where Mr. DeLatorre stumbled on a rut and injured his knee. He brought a lawsuit against the masonry contractor whose law was out there moving back and forth and against DJW-Ridgeway, the general manager of the site who had scheduled the people at the time. We've got three separate issues. One being whether Jason DeMason's conduct caused the injury, whether DJW-Ridgeway's conduct caused the injury, and then an issue that involves both of them that I'd like to start first with, and that's whether or not the exceptions to the open and obvious rules apply. Curiously, the circuit court judge apparently did not accept the open and obvious argument because he did not comment on them in his rulings. I'd like to address really the deliberate encounter exception to the open and obvious rule. Everybody agrees you can see the rut. Brian said I could see the rut I was walking on, so the question is did he have reason to walk there? And our response or our answer to that is yes, because that was his job. He had just been told by the head of the site, if you will, get your stuff here now. He had asked him, can't we have some more time? And McBride said no. At least that's our version of the events. The events are highly disputed. When this goes to trial, there's going to be stories from both sides as to what happened. This was the only way to get these 20-foot lengths of pipe in the building at the time was to use this front entrance. Was the side entrance blocked? Our testimony from Colin, the co-worker, and Brian was that this was the only way. Neither Colin nor Brian was asked about some side entrance. And I can tell the court that the question of an alternative path, which is raised in the briefs by both T.J. Ridgeway and Jason Mason, is not something that either one of them addressed. To my knowledge, I read their summary judgment motions and I read their replies down below, and neither one of them made the argument in the circuit court in their motions that there was an alternative safer path. Does it matter? I'm sorry? How much does it matter whether there's an alternative path? Their argument would be if they could get it into the back, if there was a safe alternative path to get it into some other place, then possibly Brian and Colin didn't have to use the front. The bottom line is that if they weren't able to use the back entrance, which it seems clear that all the evidence was that there was a scaffolding up in the rear entrance, they could get the pipe in the rear entrance. Then no matter where else they came, they had to walk over this dirt at some point, whether they used the front door, a little bit off the front door. Who controlled the site? T.J. Ridgeway. So Jason and Mason did not control the site? That's correct. We agree with that. Then what duty, where does Jason and Mason, where does his duty come from? The Mason's duty comes from a general duty not to do something that will injure somebody else. His work requires him to bring the lull and to bring the scaffolding with the lull, and it's inherent in the work that these ruts are going to exist. Are you suggesting that every time they come over a surface, they then have to regrade that surface to eliminate the ruts? Wouldn't that be an unreasonable burden at a construction site? Based upon my experience as a working person when I was young, yes, it would be very hard to do. But our point here is not that simply is they shouldn't have done the work at that, I'm sorry, not pronouns. Jason and Mason shouldn't have done the work at that point. When they could see people coming and they have to go from here to here. But then the evidence established that Jason and Mason or the evidence that's in this record, Jason and Mason didn't even know. And I'm sorry. Secretary Torrey was going to carry the pipes across the ruts. He wasn't even aware of that. That is the argument that Jason and Mason made, and I could disagree with it more. The evidence was, first of all, that the ground was okay that morning when they started. And Jason and Mason has a lull that's working in an area that literally is much bigger than between myself and the back of the courtroom. They had to see our people carrying 20-foot lengths of pipe one at a time across this area. They had to see the truck. Remember, Mr. McBride said the truck had to be parked in the atrium. And if you honestly recall, the atrium is just to the side. And once you park the truck here, the only way to get into this building is to walk around and come through the front. The people who are operating that lull were as close to Jason and Collins as I am to you. So now they take a lot. So we have an obligation to at least inquire what are these people doing and what can we do to help you accomplish it. That's it. And if they said, look, if they had asked that question, Jason and Collins said, look, we just need. You're saying that the subcontractor should have spoken to the plaintiff and said, gee, can we help you out here? Can we override what McBride says of the scheduling plan here just independently? Is that what you're saying, Jason and Mason should have done? I would say that, but I'm just going back to one little premise. I'm sorry, you would or would not? You would say that? Yes. I agree that they could do that. But the evidence isn't that McBride instructed. He scheduled Jason and Mason to do the work at that point, but he didn't. There's no evidence that McBride said, you have to do it regardless. I want Jason and Mason out there right now. He scheduled them at that time. But there isn't anything that suggests that Jason and Mason could on its own either have gone to McBride and said, can I hold off, or just waited themselves. Just did it. I mean, if I'm on a construction site and somebody needs to do something in front of me, I will simply step back while they do the work. I'm not going to do something dangerous. That's all we're asking them to do. We don't need a day. And everybody agreed this was a small delay. Even Frank McBride said, this wasn't going to hurt anybody. If, to be honest with you, McBride said, if somebody had asked me, I would have told him. I would have given him the time. The question is whether he was asked and what he said. But now the cases you relied on, this Melcher case and the Prez case, really talk about interaction, sharing of tools between subcontractors. There was none of that here. Jason and Mason really, how was there any extensive interaction like we found in those two cases that you relied on? This is a different situation. There isn't an interaction in the sense that the two were doing the same job, but they surely were working alongside of each other. And when more clients say, even the circuit court judge said, this is the analogy the circuit court judge used, and I can use it to answer your hundreds of questions. The circuit court judge said Jason and Mason could not use a trench, could not dig a trench and leave it unguarded. And we're saying if you make a rut, it's a small trench. Even the circuit court judge agreed with that. A rut is something that I can fall into. It's not as dangerous probably as the trench on its face, but they did have to do it and they did it. But that's not what Melcher was about and that's not what Prez was about. The facts there were different. And those are the cases that you're relying on in your brief. That's correct. And the law in those cases is simply that you can't do something on a construction site that will create a danger for somebody else. That's the law in those cases. That's why a general contractor oftentimes will ask that the subs take out a general liability policy. Right? Probably. I can't quarrel with that. I understand. In these sites, everybody's looking for coverage from everybody else. Everybody's looking for coverage, right? Everybody wants to cover this driver now. Bad things happen at construction sites sometimes. They do. But the point is it didn't have to happen here. It would be so simple if they just waited how much more time did these guys need? Did your client ever approach Jason the Mason and say, hey, can you give us a half an hour? No. No, there's no evidence in the record anyway. But you're saying that's not an obligation of your client but it would be an obligation of Jason the Mason to offer to wait but not an obligation of your client to inquire. Is that your position? No. My position is more basic. When Jason the Mason sees my client working there, he doesn't have to ask anybody. He should just stop. If I see somebody coming through with a dangerous load, I should step back. I don't need to say who would you like me to get out of the way. Wasn't Ridgway's foreman in charge there and on the site? He was on the site. So why are you saying that Jason the Mason should take the responsibility of saying, oh, should we stop? I mean there's somebody else in control there. Absolutely. Our premise, our first premise is that the person in charge of the site, Mr. McBride, should have taken care of this. He shouldn't have scheduled them in the first place. But behind that, our argument is that Jason the Mason simply shouldn't have done, should have either asked or just given them the time, just done it on their own. And no one said they could. Nobody said that Jason, there's no evidence in this record that Jason the Mason could not have just said, okay, go ahead, we'll wait. They were bringing scaffold all the way around. You know, they could have stacked a few and moved it. It was not his first trip across the terrain. No, it was actually his last trip. I think it was, ironically, I think the last piece of pipe. You know, he came that close to not being here. I mean, at what point in time does, you know, he's now familiar with the, is there, do you have a case that suggests that once you're, even though you're familiar with the open and obvious condition and you've traversed that terrain already that the duty continues? I think in terms of the deliberate encounter from my client's perspective. Does it matter? No, because the motivation to keep working doesn't change. As the law goes back and forth, my client still needs to do his job and has been told to get his pipe inside. So whether it's his first trip, his last trip or the middle trip, he still has this economic or job compulsion to do the job. That would be my answer to that. I heard a few over here. Yes, the timer went off, but you'll have time on rebuttal. Okay, thank you very much. Who will be arguing first? Okay, thank you. Mr. Huston? Huston. Thank you, Justice. In the interest of time, our position is that this falls into the willful category more than to the other kinds of cases. And if you look at the pattern of cases that talk about these kinds of exceptions and about this open and obvious rule, I mean, the exposure is small. The rut is a simple thing that's on all job sites. And I'm reading from the – I think I quoted in my brief at least partially from the – here it is – the Pateki case that says, we believe that imposing the duty to guard against distractions caused by the presence of multiple workers on construction projects ignores the reality of construction industry. Construction projects are coordinated by general contractors who hire numerous subs, each of which has general responsibilities. Each trade must work simultaneously. And to say a distraction-free environment on a construction project would be an impossible burden to meet. And burden is one of the criteria for putting a duty on somebody, and there's no way we can say there are no distractions whatsoever. If this court puts on this case, as opposed to Wolfong, that we have a duty to somehow – that there's a distraction caused by that kind of activity, that will never be an open and obvious defense. Well, but Wolfong was a little bit different, wasn't it? It was a little bit different. There, the distraction was caused by the plaintiff himself talking on the cell phone. So that's a different situation than we – No, not really. Okay, so tell me how – tell us how that is not different. It's the same way. He was doing work. He was talking to a supplier or something on the phone, and he chose to be distracted because he was talking on the phone. In this situation, you actually have – Well, but did he have to do both at the same time? He didn't have to, and therefore that was his decision. In this situation, I have quotes from the plaintiff who says, I stepped over one of the grooves and hit the next with my left. He knew exactly what he was doing. He wasn't distracted by anything. He was – yes, he had to watch for the low. It's like every time you walk down the street, when you walk down the street, you watch for steps, curbs, people. That's what everyone does. That doesn't mean you don't see them. Your eyes are moving constantly. He never said, I was distracted by the low. He said the low was over there someplace. He said he had to watch out for his coworker. He was doing all three, but he says, I never – I stepped over one of the grooves, hit the foot, and that's when my ankle popped. I was looking where I was going when I stepped on the rut. I mean, he was not distracted. This isn't like the mirror coming out of the store and bumping into something. This is someone who is on a construction site, and construction workers have to do this all the time. It's the nature of construction. Look around. Look above. Look what's going on. He's carrying a hundred-pound pipe, and he's making sure the ends are all right, and he notices he steps down on a rut. He's looking exactly where he's going. There's no distraction involved in this case. There is none. That is not an issue as far as I'm concerned based on the evidence. Well, what would be a distraction here? I mean, if he's looking out for the low simultaneously with the person he is working with simultaneously with looking at ruts, then what would be a distraction? The cases that have distractions are one where you have something that clearly is blocking your view, as in the Kmart case, or one, I forget the name of the case, where you're coming out of the port-a-potty and you look up because you're afraid of immediately something that's going to be there. You're caused to look up at a time that you're encountering a hazard that's right in front of you. He has the ability to carry this pipe and stop, look around, take another step, stop, look around, keep going. There's no indication of rush or hurry or people running or time schedule on this. I mean, this is summary judgment. It sounds like you're making an argument to a jury. Is there a material question of fact here? No. No, I don't think. That's why I read the quote. I think the facts are very clear in terms of distraction, that there wasn't a distraction. I don't think that we're arguing about that. And even if it was, again, backing back to the issue of law as to whether there is a legal, how is it a question of law? We decide duty. We look at foreseeability first, and we look to see, foreseeably, if this guy is walking toward a rut, are we supposed to anticipate that he can't stop and look where he's going and step on the right rut or step over the rut? He says he's doing it. I don't think we're arguing facts here about whether he saw a rut or did not see a rut. I just think we're talking about a situation that doesn't rise to the level where you put a duty, a burden on a general contractor to say you've got to make sure guys don't walk over ruts. But doesn't the deliberate encounter exception apply here also? No, not a bit. Not at all. I can see where the argument comes. But all the deliberate encounter cases talk about something because there's really a pressure to get the thing done. Well, here there was a pressure. Oh, there's no pressure. There's an order that says do it now. May I finish my question, sir? Sir, may I finish my question, please? I'm sorry. Wasn't there direction by the manager on the construction site to get it done now? He was told that the scaffolding was being erected immediately and that it had to be done, and there was no alternative entrance. Well, there was no, first of all, there was no complaint about this being a hazardous condition. Nobody ever complained and said we shouldn't have to go across there. There was nothing like that. The plaintiff even said, it was quoted in many, everyone's brief, that he said I didn't think it was a big deal. So this isn't something where you're being forced to do something you don't want to do. Second of all, you had a direction by the general contractor who did not stay on and tell him how to do it. He said I want that scaffold moved and get your stuff inside. Then he left it up to them to do it as they will. How they did it was the lull would come, put down the scaffolding, then it would go around back, pick up more scaffolding and bring it out. And during that time, he was free to walk across the rut and look at where he was going and make sure that he got in safely. I don't think there was anything that rises to that level of saying forced compulsion. We should have understood this man was going to be facing a known danger and he was going to harm himself. No one even thought this was a danger for that matter, but that is a factual question. And I won't get into that. Anyway, I just think that if this case is, there's always a balance between the personal responsibility and the corporate responsibility to protect the person. Will Fong stated, I think, a very clear, this court decided a very clear decision in that sort of factual situation. And I frankly just do not see that this one rises to that level that says, OK, we're going to shift it now over to the general contractor. And he's not going to not just prevent this guy from carrying that pipe in that way. But he's going to have to make sure if that's his duty, that no one walks over a rut with a hundred pound weight on their shoulder. And I just think that's an overwhelming burden. And burden is one of the key elements of duty. And then one last question I had. Would it have been too much of a burden to expect that the masons could have been asked by the construction manager to hold off a little bit until these pipes? I'm sorry. Until the pipes got in? He certainly could have done that. I mean, that goes somewhat to the issue of the 4-1-4 argument. He is not telling them how to do their job. This is typical on a construction site where the guy running the contract says, I want this done and this done. You guys figure it out. Also on construction sites, the general contractor will have 4-by-8s boards to lay down over ruts between runs of heavy equipment over a site so that people can walk it back and forth. I've been on construction sites. You walk back and forth over that terrain, get that work done. Then you remove the 4-by-8s and let the machinery get back to work. How much of a burden is that? That's not a great burden. But that's usually something done for mud more than for ruts. Ruts are pretty typical on all construction sites, frankly. And I think in this one that's something that those two people could have had worked out themselves. How much was 6 to 8 inches? Or what were they, 4 to 8? 6, 6 to 8 on this one. Yeah, the Wolfhawk case was 8 to 10 inches. But then you have to put down the planks and then you pick them up because the lull's coming. Then you put down the planks and then pick them up because the lull's coming. Right. That's not easy. Either that or you shut down Jason Mason's work for a couple hours. It wouldn't have been hard for the two of them to say, hey, give us 10 minutes, we'll get the stuff in. That's why our expectation. That's why the burden falls on the subs, not the general. To work it out. We don't deal with means and methods, and that was a means and methods issue. Okay. Any other questions? No. Thank you. Thank you so much. Mr. Sanders? Again, good morning, Your Honor. Good morning. My name is Mike Sanders and I represent Jason Mason. In our brief, we have two contentions on why the trial court corrected their summary judgment. Our first contention was that we had no obligation as a fellow subcontractor to protect the plaintiff from the rust, because we did not control the work, we did not control the job site. We had no interaction with the plaintiff or the plaintiff's employer, and we had no obligation or right to schedule or coordinate the work or overall job safety. Well, was interaction required then to impose a duty? Yes, Your Honor. Under the cases, for example, Perez, the court talked about the extensive interaction in Melchers that gave rise to the duty of the subcontractor to protect the plaintiff. They talked about the fact that in Melchers there was a contract between the plaintiff's employer and the electrician, if I recall correctly, or I'm sorry, the excavator, about having the electrician continue to dig the trench. Also, they supplied equipment such as, I believe it was shovels and a wheelbarrow, and it was part of their equipment that fell down on top of them because the defendant in that case was helping move the dirt in and out, and there was an extensive interaction and coordination between them. And in this case, there is no such interaction. In fact, the plaintiff testified that he had no communication with Jason Mason on the day of the accident, and the plaintiff also testified that he and his crew, I think he used the word, were an isolated team, and there's nothing in this record to suggest that there was any interaction between Jason Mason or the plaintiff or the plaintiff's employer on this case. Well, he saw them on the site. Couldn't they have seen what was happening and said, we'll hold off just a little bit with this scaffolding? Well, I have to disagree with counsel. There is no testimony in that regard. In fact, the testimony, for example, from Jason Mason, there are two depositions of Jason Mason employees, and neither deposition talks about any contact with the plaintiff. In fact, both of those employees testified they didn't even know who the plaintiff was or know about this accident. And the plaintiff himself testified that not least on the day of the accident, he had no communication, and there was no testimony from the plaintiff that he had any communication with them at all. And, indeed, the plaintiff testified that he was parked, per the instruction of Mr. McBride, remember, he testified that Mr. McBride told him to park his truck inside the atrium, and he also testified that none of our laws were going in or out of the atrium. And, in fact, he testified that in one of his statements was that we were working at the end of that photograph that was part of the plaintiff's record, that we could have been off the photograph at the time of the accident. And, in fact, at the time of the accident, he testified he looked over there and saw that our wall driver had his back to him, was looking the other way. So, again, there's really no interaction there or no testimony from this record at all that there was any interaction or that we knew he was there. Even in the absence of some testimony that there was interaction, isn't it common knowledge that on construction sites you're going to have several subs working together? It is. I mean, so if you're creating a dangerous condition and you know that people are likely to be traversing that area, wouldn't it make common sense that you inquire with the general and say, is anybody else going to be using this because we're going to be creating this condition? I would say, Jester and I, that there is no duty because that would create an unreasonable burden for us. I mean, in this case, our obligation, our contractual obligation, was simply to put up the masonry on the exterior. Plaintiff, of course, was working on the interior. He was the general contractor who had the obligation for scheduling and coordinating the work. So there is already somebody scheduling and coordinating the work. And if we were going to have to, every time we moved our wall or did any work, would have to stop, inquire of all the subs who were on that job site. And McBride testified that there was typically many people on the job site. He couldn't say exactly how many were on this time. He said a typical situation where many contractors. To make us get off, stop our work, and coordinate each and every one of them, because remember, we were moving our walls from the back to the front, so circling the better part of this, and say, stop. What do you guys need to do? Do you need any assistance? Do you need us to wait? What do you need to bring in and bring out? That would suddenly create a burden on us that we did not contractually undertake and, in fact, was an obligation that somebody else, the general, had already contractually undertaken to schedule and coordinate the work. So you don't agree with Mr. Houston that Ridgway doesn't deal with means and methods then? Well, not in terms of scheduling. I mean, yes, it's a very easy situation. In fact, the trial court pointed out that this really was a case of scheduling. It was a situation where the general decided that he wanted the elevator to continue to be installed at the same time that we are moving our equipment. Again, that's a situation where the general knows what the plaintiff needs. In fact, the plaintiff testified. Remember, the plaintiff testified that he asked for additional time. He asked that he needed a couple of hours but was told, get your stuff here, period. I may have got that quote a little wrong. We didn't know that. There's absolutely no testimony that we, Jason and Mason, knew that suddenly that he had this rush to get this in, and there's no testimony that we knew he had only one entrance to get this in. Again, we're taking down a scaffold in the back, and at the time the plaintiff testified that the walls are down. Why can't we assume he could do some other way to get in? He has to put that knowledge onto us. So unless Your Honor has any questions, again, we ask the court to affirm for two reasons. First, that there's no general duty from one sub to another. Based on the facts of this case, the lack of interaction, the lack of control, the lack of scheduling, and we'd ask the court to affirm also that there's no duty based upon the four-point duty analysis that's traditionally used by the court. I would point out the plaintiff really hasn't discussed this. As we discussed in our brief, looking at those four factors, we show that there's no duty on us because the burden is overwhelming, and again, on the open and obvious part, there's no evidence that we presented on this record that we knew or had reason to know of any economic compulsion or any other reason for him to encounter these ruts. So unless Your Honor has any questions, we'll end the argument. We'll just stand on the brief. Thank you. Thanks. Mr. Ressa? Thank you. I'll be brief. I have three small points I'd like to make. Justice Burkett mentioned the ability to put down 4-by-8 sheets of plywood. There wasn't any testimony here that those sheets were available on the job site, but Jason Mason did argue in its brief was that they should have put down 2-by-12 planking. Well, trying to carry, if Your Honor's have, whether you've done it or not, trying to carry a 20-foot pipe weighing 60 pounds on a 2-by-12 planking, that's 12 inches,  Carrying that pipe is dangerous if you're on a flat surface. It's a problem. It's a dangerous job. Just like carrying shingles up a ladder, it's dangerous, no matter what the conditions are. And I can see where Your Honor's headed. My point would be there's a duty not to make it more dangerous, which would lead me to the case I wanted to mention to Justice Inhofe, and that's the Zaralda case. That's the case you cited where one subcontractor left an elevator door open and somebody else fell down the open elevator shaft. No interaction. Just you can't create a danger. I mean, that danger is more dangerous than putting a rut on the site. But everybody's agreed that these ruts are dangerous. Even at Dieburg they said that. And my final point, unless the Court has some questions, was that Jason argued in its brief that the plaintiff should have asked the Masons to wait. That's at page 38 of the brief. If Jason, if their brief is arguing that my client blew the deliberative tonic because he didn't ask them, that implies that the Masons would in fact have waited, just as what I told this Court in my opening statement. If Jason, the Masons' brief said my client did something wrong by not asking them to wait, that can only be a valid argument if, in fact, Brian had asked the Masons to wait and they could have waited. Otherwise, the argument that they make doesn't carry any water. It wouldn't do any good for Brian to ask the Masons to wait a few minutes if they couldn't. As soon as you make the argument that the – Wait a second. If McBride tells Jason the Mason to wait, he's in charge of the job site and scheduling. Yes. He could tell them to wait. McBride clearly has the authority to do it. I'm just pointing at Jason. Jason the Mason was making the argument that nobody asked us. Well, that's true, isn't it? And my point is, but they also – Jason the Mason, that's true. Jason the Mason always said we didn't have any authority to wait. And that was part of the argument in the brief. Jason the Mason said we're under the control of Mr. McBride. Even if Brian asks us, we can't do anything. And that's their argument. I'm sorry. Did you say if McBride asks them, they can't do anything? No, no. Jason the Mason's point in their brief was that we're bound by Mr. McBride. If somebody else asks us to wait other than Mr. McBride, we can't do anything. Jason the Mason said we can only do what Mr. McBride tells us, and Mr. McBride of Ridgeway did not tell us to do. So what would be Jason the Mason's alternative, to walk off the job site? Yes. No, I'm sorry. I was anticipating my client, Brian, because they suggested you should just quit. No, their alternative was just to simply wait a short period of time. Even though your position is that had they asked for permission to wait, it would have been denied. So they should just ignore McBride's direction? No, Mr. McBride actually. The testimony is so convoluted. Mr. McBride testified that if somebody had asked him, he would have said yes. He would have let them wait. But nobody asked him. Nobody asked him. Well, no, our clients did. I'm sorry. Brian and Colin asked him. That citation is in my facts. Brian and Colin asked Mr. McBride, we need more time. Can we get in? We just need two or three hours. And he said, no, go ahead. That's our testimony. It's confusing because the testimony is. That's why there's a material question. I can get tied up quite easily if you let me talk long enough. I have no doubt about that. But my point here is that if Jason the Mason is arguing, Brian was wrong because he didn't ask us to wait, that implies to me that even Jason the Mason on its own could have decided to wait. Otherwise, Jason the Mason's own argument doesn't make any sense. Unless the court has further questions or clarification or something like this, we're relying on Bruce. Thank you. Okay. Thank you very much. Thank you, counsel, for your arguments. The court will take the matter under advisement and render a decision in due course. We stand in brief recess until the next case. Thank you.